## ESTATE OF JOSEPH YOUNG, DECEASED.

### APPEAL BY ANN. M. YOUNG FROM THE ORPHANS' COURT OF FRANKLIN COUNTY.

Argued June 2, 1890—Decided October 6, 1890.

(a) On the distribution of the insolvent estate of a decedent, his widow, alleging that her separate estate had supplied a part of the purchase money, when, forty years before, her husband purchased from her father real estate the proceeds of the sale of which were in the fund for distribution, made claim to a proportionate share of such proceeds, under a trust resulting in her favor:

1. Her claim being asserted for the first time after so long a delay, and supported only by a charge of cash against her on her father's books, indefinite as to date, and by evidence of declarations made by her father and husband, but not at the time of the conveyance and part of the res gestæ, the evidence was insufficient to establish the trust asserted, and the claim was disallowed.

Before PAXSON, C. J., STERRETT, GREEN, CLARK, WILLIAMS, McCOLLUM and MITCHELL, JJ.

No. 6 May Term 1890, Sup. Ct.; court below, number and term not given.

On September 10, 1888, the account of the administrators of the insolvent estate of Jacob Young, who died on November 3, 1886, was referred to *Mr. W. Rush Gillan*, to report upon exceptions filed and to distribute the balance shown.

Ann. M. Young, the widow of the decedent, appeared before the auditor, and made claim that she was entitled to have one fifth of the purchase money of a tract of land, sold by the administrators of the decedent, by reason of a trust in her favor arising, as alleged, from the fact that her separate estate had furnished one fifth of the purchase money when the decedent acquired the title thereto. The leading facts shown were, that on April 8, 1848, John Nisewander, the father of Mrs. Young, conveyed the tract in which the trust was claimed to Jacob Young, then the husband of the claimant, by a deed reciting a nominal consideration of $5,000; that of this consideration Young paid $4,000, and $1,000 was left in the land, as was claimed, for Mrs. Young, and was never paid to the grantor, who died on September 16, 1887, leaving a family book wherein was an entry charging Mrs. Young with $1,000 cash, as of the year 1848, without more exact date; and that in the settlement of her father's estate Mrs. Young was charged with this $1,000 as an advancement. Before this hearing, no attempt had ever been made to enforce the alleged trust. Upon the testimony of James K. Wilson and John H. Nisewander, the latter a brother of Mrs. Young, sufficiently appearing in the opinion of the court below, and the book entry referred to, the auditor found in favor of the claim made, and awarded thereto $711.90.

Exceptions to the auditor's report having been filed by certain lien creditors of the decedent, after argument thereof, the court, STEWART, P. J., filed an opinion, which so far as related to said claim, was as follows:

The other exceptions filed separately to the auditor's report, by Messrs. McLanahan, Zacharias and Alexander, on behalf of creditors, indicate as the chief point of controversy the finding by the auditor of a resulting trust in favor of Mrs. Ann. Young, to the extent of $711.90, and the distribution to her of this amount out of the proceeds arising from the sale of the real estate. The inquiry we have here presented is this: Does

the evidence adduced in support of the claim of Mrs. Young establish any trust relation whatever in connection with the real estate conveyed by John Nisewander to her husband, Jacob Young?

It is to be observed, first of all, that parol trusts in opposition to legal titles are not favored. Such is the equitable rule; and, in any inquiry of this kind, we necessarily start with the presumption that the holder of the legal title is the owner, as well, of the beneficial interest in the thing conveyed. To rebut this presumption and show that the beneficial interest is in another than the grantee of the legal title, the evidence must be full, clear and explicit, such as would satisfy the conscience of the judge sitting as a chancellor. Upon evidence of this character, equity will recognize the trust and decree its execution. The evidence in the case before us, is exclusively in support of the trust. It is uncontradicted and the witnesses are unimpeached as to their credibility. We are to decide only upon its sufficiency.

On April 8, 1848, John Nisewander conveyed to Jacob Young, his son-in-law, a tract of land in Montgomery township, containing one hundred and fourteen acres, for the consideration, so mentioned in the deed, of $5,000. Young and his wife continued to occupy this tract of land, with the exception of some acres which they sold to Jacob Burkholder, until Young's death in 1886. The administration upon Young's estate disclosed his insolvency. The land was sold by his administrators under an order of sale for the payment of debts, yielding a fund for distribution out of this particular tract of $4,680. The first lien on the land was a mortgage for $1,120.50 in favor of Nathan Miller, which, being protected by the recording acts, was allowed in full.

Of the remainder of the fund, Mrs. Young, widow of Jacob Young, claimed the one fifth, on the ground that one fifth of the original purchase money, to wit, $1,000, had been paid by her with her own money. Her contention is that a resulting trust was thereby created, by virtue of which she became the owner of a one fifth beneficial interest in the land conveyed to her husband, and she relies upon the testimony of the two witnesses produced to make good her claim in this regard. These witnesses speak to occurrences and conversations of nearly

forty years ago, but no attempt has been made to discredit either, in any respect where they speak from personal knowledge and recollection. It becomes necessary to examine the testimony of each in detail.

Speaking with reference to the conveyance of the land by Nisewander to Young, Wilson, the first witness says: "He, Nisewander, told me, after the transaction was all over and completed, how he had done. He said he had left $1,000 in the home farm for his daughter, Ann Young, and Mr. Young had paid out the balance of the purchase money. This farm that he was speaking of was the same farm that Jacob Young owned at his death, and on which he died. He told me what he had given the other children. He said he had given land to Joe and Dan and money to John, his sons, to make them equal. I had a good many conversations with him in which he talked over the distribution of his estate. Jacob Young told me the same that Mr. Nisewander did, that he, Nisewander, had left $1,000 in the land." Upon cross examination he testified: "This conversation with Nisewander was in 1852 and 1853, and along there. I knew nothing of it till Mr. Nisewander told me, and that was after the transfer was made. I think he told me how much the farm was, but I don't remember. I paid no attention to his conversation, I was young then. It seems to me he said Young had to pay $3,000 or $4,000 out, but I don't remember. The only figures I can recollect are the $1,000. He told me the others, but I can't remember them."

The other witness, John H. Nisewander, a brother of Mrs. Young, testified: "I do not remember what Jacob Young was to pay for the land, but think it was $5,000. There was no portion of said tract of land given said Ann. Young, but I know, and was told by my father and mother and Ann. Young, that $1,000 or more, was to be left in said farm as her share or portion in said farm, and the balance of said purchase money was given in notes and paid the rest of the heirs as the same became due." In answer to the question "If your father presented Ann. Young with any part of the tract of land conveyed to her husband, state the value in money of said present, and state fully how your father did make such present, if any such present was made, and state whether what was done there that

Opinion of Court below.

day, was done with the knowledge and consent of Jacob Young,"
the witness said : " The value in money was to be $1,000, or
more, and was left in said farm as her share as one of the heirs,
and the same was with the knowledge and consent of said Jacob
Young." Upon cross examination, he testified that he was not
present at the execution of the deed or its delivery to Young,
and does not know before whom it was acknowledged or who
were present at its acknowledgment; that he did not see the
deed and does not know to whom the land was conveyed or how
many acres it contained. " Q. Did any of the talk or conversa-
tion of John Nisewander, which you have given in your an-
swers in chief, occur at the time and place the deed was signed,
acknowledged and delivered, or was it said in conversation with
you at other times, and if so, was it before or after the deed was
made and delivered to Jacob Young? A. Said talk or conversa-
tion was before and after said deed was made and delivered to
Jacob Young." He further testified, as to the price of the land :
" To the best of my knowledge $5,000 ; as it was offered to me
for the same, with the understanding that I was to leave my por-
tion in said farm. Do not know how much was paid down, the
balance was secured with notes. Q. Were you present when the
transaction happened? Where was it, and who else was present?
A. I was not present when the transaction happened. It was
done at the home farm, in Franklin county, Pa. Do not know
who was present. Q. Didn't your father sell and convey the en-
tire title to the land to Jacob Young, and upon his payment of
certain notes then given by Young, was not the land to be his,
and did not Young afterwards pay the notes in full? A. He
sold the same to Jacob Young with the knowledge and under-
standing that the said $1,000 of Ann. Young was to remain in
the same, but said Jacob Young paid the balance of said notes
in full, that is, the notes that were given as the balance of said
purchase money." And later on he says : " He sold the same
cheaper to said Jacob Young than to a stranger, in order to
keep the same in the family; and the same was done also to
help said Young in the purchase of the farm by giving to Young
the portion that would be coming to his wife, Ann. Young, at
the death of her father. Jacob Young did not buy said land
absolutely, but the portion or share of said Ann. Young was
to remain in said farm, and it was so understood at the time.

There was nothing said about any portion of the land belonging to Ann. Young, and there was nothing said why the deed was made to Jacob Young alone, and not to him and his wife jointly."

I have thus collated all that is material in the testimony of these two witnesses, and there is nothing outside of this having any bearing upon the case, except the fact that in the book of advancements of John Nisewander there appears a charge.of $1,000 against his daughter, Mrs. Young, under date of 1848. Does this evidence enable us to conclude with reasonable certainty that any part of the original purchase money for the land was paid by or on behalf of this claimant, Mrs. Young ? If it does, then the law will presume some benefit for her was intended, and a resulting trust arises for her in proportion to the amount so paid. This presumption, however, is in its turn liable to be rebutted by facts showing a negative presumption.

The burden, then, is upon Mrs. Young, in the first instance, to prove that she paid part of the purchase money for the land. It is the one vital and material part of her case, and this naked fact, once established by such evidence as the law requires, invests her with a prima facie right.

The testimony of the witness Wilson relates wholly to conversations he had with John Nisewander, the grantor, and with Jacob Young, the nominal purchaser. The declarations of the former were objected to, and ought not to have been received or considered. Had John Nisewander been offered as a witness, he would have been competent to speak to the transaction and tell all that he did in connection with it; and it might well be that his evidence would be very material, since if any money was paid for Mrs. Young in the transaction, it was his hand that paid it. But he is dead, and his declarations touching this transaction, made out of the presence of the only other parties concerned therein, would not be competent to affect either. Such declarations are admissible to affect adversely the interest of the party making them, but John Nisewander and his estate are without any interest in this controversy. Wherever declarations of the grantor have been admitted in cases of this character, they have been part of the res gestae ; and, since it is from the transaction itself that equity will infer the trust, and not from the agreement of the parties, all that was said and

Opinion of Court below.

done, in connection with the transaction out of which the controversy arises, becomes competent and material. But these declarations we are now considering were made some four years after delivery of the deed; they do not relate to the period of the transfer, and are not connected with it in any way: Riddle v. Dixon, 2 Pa. 372. They cannot therefore be considered.

The only material part of Wilson's testimony is found in his statement that " Jacob Young told me the same that Mr. Nisewander did; that he, Mr. Nisewander, had left $1,000 in the land." Standing by itself this admission of the nominal purchaser would be wholly insufficient to show that any part of the purchase money had been paid either by or for Mrs. Young, while if we refer to the testimony of the witness with reference to his conversations with Nisewander, to get a better understanding of its full import, we discover that the admission was made as much as four or five years after the delivery of the deed. He, the witness, says that he knew nothing in regard to the transaction until told by Nisewander, and " that was in 1852 or 1853 and along there." This fact may not be of any special significance, and yet it is entirely proper to derive it from the conversations with Nisewander to which reference is made. But beyond this we cannot go, in any attempt to discover from Nisewander's conversation what Young told the witness. He does not say that he told him all that Nisewander told him concerning the transaction. His language is, " Young told me the same that Mr. Nisewander did, that he, Mr. Nisewander, had left $1,000 in the land." The evident meaning of this is, that what Young told him was simply that Nisewander had left $1,000 in the land, a fact which he had previously learned from the grantor himself. It neither expresses nor implies anything beyond this. And what does such an admission signify? How did the grantor leave the $1,000 in the land? for whose benefit? on what terms? Whether as a gift, or loan, or debt to be secured for his own benefit or another, does not appear; and it might be either.

Very much of the testimony of John H. Nisewander, the only other witness, is objectionable for like reasons and should have been excluded. This witness was not present at the transaction, never saw the deed, did not see it executed or delivered, and, so far as the evidence discloses, was never present at any

of the interviews which led up to the conveyance. What he knows about the matter he learned from his father, the grantor, his mother and Mrs. Young. He does not even intimate that he ever had any conversation with Jacob Young, the nominal grantee, on the subject, unless where he says that "$1,000 or more was left in the farm as her (Mrs. Young's) share, and the same was with the consent of said Jacob Young." He does not say from whom he learned of Young's assent, whether from Young himself, or from his father, mother or sister. It is certainly just as reasonable, and far more so in view of his earlier statement, to infer that he learned it from one of the latter, as it would be to conclude that Jacob Young had so told him. An important fact like this should not be left to inference. He nowhere speaks of any conversation he had with Young, but, on the other hand, does say that what he knows about the matter he learned from his father and mother and sister. It would be most unsafe to give to this assertion of Young's assent the force and weight of an admission coming from the party himself. If coming from any other than the party himself, of course it is hearsay and therefore unimportant.

It is beyond question that the declarations of the mother could prejudice no one in this controversy, and, so far as the witness's knowledge is derived from her, it is not worth considering. Nor is any greater weight to be attached to facts which he derived from his sister, Mrs. Young. Her declarations, if against her interest, would be competent evidence, but here they are introduced to make for her interest. Whatever was learned from her was inadmissible from any and every standpoint. This leaves, as the sole source of the witness's information, John Nisewander, the grantor, and it results that Mrs. Young's claim rests upon no other support than the statements made by John Nisewander in his lifetime, and the charge contained in his book of advancements against his daughter.

This is not stating the case too strongly against her. It is possible that the witness, John H. Nisewander, derived his knowledge of the facts from such a source and in such a way as to make his testimony admissible and forceful as well. But the mere possibility of this being so can add nothing to its character or weight. The consideration to be given to the evidence of a witness depends upon his means of information.

Opinion of Court below.

In his examination in chief, the witness, in speaking to the main fact, says, " I know and was told by my father and mother and Ann. Young." The plain meaning of this is that he knows the fact because he was told it by the persons named. He discloses no other source of information whatever. Coming, then, as hearsay from John Nisewander, the testimony of the witness is entitled to but little consideration or weight.

Had the ground been laid by giving prima facie evidence to establish the trust, it is possible that declarations of the grantor before and after the conveyance would be competent as corroborative evidence; but here they are offered to establish the prima facie case in the first instance. Giving to them all the weight they are entitled to, and considering in connection therewith the only outside circumstance offered in support of Mrs. Young's claim, viz.: the advancement charged against her, the evidence falls short of its purpose. It is not upon such uncertain and ambiguous evidence as this that resulting trusts are to be established. The rule requires evidence full, clear and convincing, and very properly so.

Here we have a transaction which took place nearly forty years ago. Upon the face of the conveyance a title to the entire interest in the land was intended. The evidence to contradict it is wholly parol. During all the intervening period, nothing whatever was done to compel an execution of the trust, if any existed, nor was any attempt made to perpetuate the evidence to establish it if denied. If the deed to Jacob Young was not what it purported to be, is it any hardship to require of the party who would gainsay it, clear and convincing evidence of her claim, after she has allowed forty years to go by without an effort on her part to protect herself? The rule has abundant reason to sustain it, and the case we are considering is a very proper one for its application. In our judgment the evidence is insufficient to establish the claim set up by Mrs. Young, and the exceptions to so much of the auditor's report as allows it, are therefore sustained.

In the view we have taken of this case it is unnecessary to consider the other questions raised upon the argument of the case, viz.: whether, the facts being established, the trust created was express or resulting, and how the transaction was effected by the fact that it occurred before the passage of the married woman's act of 1848.

Opinion of the Court.

The other exceptions not heretofore noted to the auditor's report are overruled. The report is referred back to the auditor to reform the distribution in accordance with this opinion.

A second report of the auditor in accordance with the foregoing opinion, having been filed, was confirmed by the court and distribution ordered; whereupon the claimant took this appeal, specifying that the court erred in sustaining the exceptions to the auditor's first report, in holding that the claimant was not entitled to the share of the fund claimed by her, and in confirming the auditor's second report.

*Mr. W. U. Brewer* and *Mr. O. C. Bowers* (with them *Mr. B. F. Winger*), for the appellant.

After discussing the evidence, counsel cited: Rupp's App., 100 Pa. 531; Feig v. Meyers, 102 Pa. 10; Hoover v. Hoover, 20 W. N. 538; Darlington's App., 86 Pa. 512; Henderson v. Maclay, 5 Cent. R. 225; Harrold v. Lane, 53 Pa. 268; German v. Gabbald, 3 Binn. 302; Bigley v. Jones, 114 Pa. 510; Peiffer v. Lytle, 58 Pa. 386; Beck v. Graybill, 28 Pa. 71.

*Mr. William Alexander*, (with him *Mr. H. Gehr* and *Mr. A. G. McLanahan, Jr.*,) for the appellees.

Counsel cited: Cross's App., 97 Pa. 471; Nixon's App., 63 Pa. 279; Kline's App., 39 Pa. 463; O'Hara v. Dilworth, 72 Pa. 397; Buchanan v. Streeper, 11 W. N. 434; 1 W. & T., Lead. C. in Eq., 354; Fox v. Lyon, 33 Pa. 474; McCall v. Webb, 88 Pa. 154.

PER CURIAM:

We adopt as the opinion of this court the opinion of the learned judge of the court below, so far as it regards the claim of the appellant.

The decree is affirmed, and the appeal dismissed at the cost of the appellant.